199 P.3d 72

**Mervyn RAPOZO, Petitioner/Plaintiff–Appellee**

v.

**BETTER HEARING OF HAWAII, LLC, Respondent/Defendant–Appellant.**

No. 27602.

Supreme Court of Hawai'i.

Dec. 5, 2008.

As Amended on Reconsideration Jan. 14, 2009.

Joe P. Moss for petitioner/plaintiff-appellee.

Michele–Lynn E. Luke (Kessner Umebayashi Bain & Matsunaga), Honolulu, for respondent/defendant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold that the Intermediate Court of Appeals (ICA) erred in concluding that the findings of fact (findings) of the district court of the fifth circuit (the court) to the effect that (1) hearing aids purchased by Petitioner/Plaintiff–Appellee Mervyn Rapozo (Petitioner) were "nonconforming" under Hawai'i Revised Statutes (HRS) § 481K–1 (Supp. 2007) of HRS chapter 481K, the Assistive Technology Warranty Act (the Act) and that (2) Respondent/Defendant–Appellant Better Hearing of Hawaii, LLC (Respondent) had a reasonable opportunity to repair the devices pursuant to HRS § 481K–3 (Supp.2007) of the Act were clearly erroneous, and therefore that (3) the court erred in awarding

Petitioner a full refund of the costs of his hearing aids, a double recovery of his alleged pecuniary losses, and attorney's fees and costs under HRS chapter 481K. *See Rapozo v. Better Hearing of Hawaii,* 118 Hawai'i 285, 293, 188 P.3d 799, 807 (App.2008). Accordingly, the September 5, 2008 judgment of the ICA is reversed in part for the reasons stated herein, and the court's April 17, 2005 judgment is affirmed.

The petition for writ of certiorari was filed by Petitioner on September 10, 2008, and accepted on October 20, 2008. In his application, Petitioner seeks review of the ICA's September 5, 2008 Judgment filed pursuant to its June 26, 2008 published opinion,[1] reversing the November 17, 2005 judgment of the court[2] in favor of Petitioner and against Respondent. This court heard oral argument on the merits on November 20, 2008.

I.

On February 10, 2004, Petitioner purchased digital hearing aids for both ears from Respondent at its Lihu'e, Kauai location. Gary Woodard (Woodard) is the owner of the Lihu'e store. The aids were manufactured by Starkey Labs (Starkey), which is located in Anaheim, California. Respondent is a dealer for Starkey. According to the purchase agreement, the price was $5,198.00 after an open house discount of $4,460.00. Hawaii Medical Service Association, Petitioner's medical insurance carrier, covered $1,044.00 of the cost, Petitioner paid $100, and financed the balance of $4,054.00 through "GE Money Bank." Prior to purchasing the aids, Respondent gave Petitioner a general ear examination to eliminate any potential that he might need a medical referral.[3] The results of the ear examinations were normal. Petitioner was also given a hearing test, the data from which was used to initially program the hearing aids. Respondent took molds of Petitioner's ears and sent them to

---

1. The published opinion was authored by Associate Judge Katherine G. Leonard, who was joined by Chief Judge Mark Recktenwald and Associate Judge Corinne K.A. Watanabe.

2. The Honorable Trudy K. Senda presided.

3. Woodard's testimony to this effect was that "when the client ... first comes in we do an initial video to scope exam. That's where we have a fiber optic video camera. It shows the ear canal on the T.V. This is the check for any perforations, any cysts, tumors, wax blockage. Anything that would require a medical referral."

Starkey, who then manufactured custom aids for Petitioner and shipped them to Respondent within approximately ten days.

Petitioner testified that he did not recall receiving any documents from Respondent when he purchased the devices. Respondent asserts that Petitioner was provided with warranty documents from Starkey, and two warranties from Respondent. The "Starkey Labs Warranty Card" stated that the hearing aids would be repaired or replaced at the discretion of the manufacturer if failure occurred within the one-year warranty period. A paper copy of the "Starkey Labs Standard One Year Warranty" referred to free replacement due to loss of hearing aids once per side for one year, replacement due to damage once per side for one year, and unlimited refitting of the aids. However, there is no address for Starkey on the warranty card or on the warranty document. According to Woodard, generally there is no direct contact between Starkey and end users of the product.

Respondent itself provided a "30 day total satisfaction money back guarantee," meaning that whether the aids worked or not, a consumer could receive a full refund within the first thirty days for any reason, and a "Life Time Customer Service Guarantee" for free office visits, hearing tests, cleaning and adjusting of the aids, programming, and minor in-office repairs.

Respondent claims that all customers are advised prior to purchasing the aids that they will have to be fitted for the earpieces and then "must return for testing and adjustment ... because the device is essentially a sophisticated amplifier which requires digital adjustment based upon feedback from the customer." Respondent asserts that Petitioner was informed both when he purchased the aids and when he returned to the store to pick up the aids, that he would need to return for "at least 3–4 adjustments in the first 30 days."

The facts regarding Petitioner's problems with the hearing aids and the circumstances of the "repairs" are disputed. According to Petitioner, he had ongoing problems with the aids from the time of purchase. He heard all kinds of sounds, and sometimes he could only hear sounds that were at a distance and sometimes he could only hear sounds that were in close proximity. He took the aids back to Respondent on four to five occasions within the first few months, but continued to have the same problems with them during the course of Respondent's "adjustments."

It is undisputed that, sometime in May 2004, Petitioner started hearing clicking sounds in the aids. According to Respondent, despite the fact that Petitioner had visited the store several times for adjustments, the first time that Petitioner voiced any complaint about the aids was when Petitioner brought the aids into the Lihu'e store in May of 2004 complaining of the clicking noises. Respondent sent the aids to Starkey, the manufacturer, to be repaired at no cost, pursuant to the one-year warranty. According to repair invoices dated May 20, 2004, Starkey replaced the speaker and microphone on each aid. Respondent claims that the aids were likely out of Petitioner's possession for about ten days for this repair, whereas Petitioner claims he was without the aids for "about a month or so."

The aids were returned by Starkey to Respondent at the end of May 2004. Petitioner went to Respondent's store to retrieve the repaired aids and for an adjustment, which was performed by Tara Kadar (Kadar), Respondent's technician. Petitioner claims he continued to have problems after the aids were returned. Sometime in late May or early June 2004, he attended his class reunion and could not hear anyone at his table, but could only hear sounds that were emitted far from his table. In a letter dated June 17, 2004, Petitioner's wife, Fay T. Rapozo (Mrs. Rapozo), wrote to Respondent asking whether the aids could be returned:

> I'm writing you quite disturbed and concerned that [Petitioner] is not getting the effects required off of the use of his hearing aide [sic]. *He carries it around and does not use it, and has not used it for a full day since he purchased it. And I know you can attest to that since he has been coming in for adjustments, and mentioning to you the problems.*

*I want to know if there is a possibility that the unit be returned.* I can't see paying for something that does not work, it makes not [sic] sense.

I appreciate all that you have been doing, and it would have been marvelous that the unit work cause he needs it, but in the tight crunch of financing, paying four thousand dollars and having it sit on the shelf, just does not cut it for me.

(Emphases added.)

Woodard related that this was the first time that he personally became aware of Petitioner's problems.[4] After learning of these matters, Woodard stated that he instructed Kadar to have Petitioner come in for more adjustments, but it does not seem that Kadar ever passed this request on to Petitioner in June 2004.[5]

In about September or October of 2004, Petitioner returned the aids to Respondent indicating that he did not want them because they were not functioning properly. Despite his wife's written inquiry as to whether Petitioner could return the devices and obtain a refund, Petitioner did not receive a refund. Instead, in December 2004, Respondent's representative brought the aids to Petitioner's home and told Petitioner that he had purchased them and he should keep them. Kadar wrote a letter to Petitioner, stating, in part:

I am sorry about the way things happened with the hearing aids, it is my goal to help those that are seeking help with their hearing. I know that you were very frustrated and felt hopeless with the aids that

we had, I too felt very helpless not providing you with the service that you needed.

Woodard admitted that he had never read HRS chapter 481K prior to this suit; accordingly, his position was that a customer can only return hearing aids within thirty days.

## II.

On July 13, 2005, Petitioner filed a complaint against Respondent in the court. As paraphrased by the ICA, the complaint alleged the following:

(1) the hearing aids came with a one-year guarantee; (2) [Petitioner] returned the hearing aids for repair at least five times within the one-year period; (3) the hearing aids were out of service for over thirty days; (4) [Respondent] failed to comply with [HRS § 481K–3] when it failed to accept the return of the hearing aids and make a refund; and (5) therefore, pursuant to HRS [§ 481K–5 (Supp.2007) ], [Petitioner] was entitled to recover twice the amount of his pecuniary loss, costs, disbursements, and reasonable attorney's fees.

*Rapozo*, 118 Hawai'i at 287, 188 P.3d at 801.[6]

A one-day bench trial was held on September 22, 2005. *Id.* at 287–88, 188 P.3d at 801–02. The only witnesses were Petitioner and Woodard. At the close of the hearing, the court stated that the parties could submit written closing arguments by October 6, 2005. In Respondent's closing argument filed on October 5, 2005, it argued that there was no nonconformity[7] because the aids "worked according to their design and industry standards" and that the "only repair [to

---

4. Woodard was apparently unaware that the aids had been sent to Starkey for repair until June of 2004, when he was informed of the repair by Kadar. The court's finding 18 states that "Woodard had not been aware that the hearing aid was sent to [Starkey] in May 2004 for repair." Finding 19 states that "[a]fter becoming aware of Mrs. Rapozo's letter, Woodard also learned of the attempted repair by [Starkey]."

5. Finding 20 states that "Woodard instructed Kadar to have [Petitioner] come into [sic] [Respondent's] place of business for further adjustments, but [Petitioner] did not do so and it does not appear that Kadar ever communicated such request to [Petitioner] in June 2004."

6. HRS § 481K–3(a) (Supp.2007) and the relevant portion of HRS § 481K–5 (which is the section that provides a right of action to consumers) are set forth *infra* at page 16.

7. HRS § 481K–3(a) states that "[i]f the manufacturer or its agents fail to correct a *nonconformity* as required by a warranty after a reasonable opportunity to repair, the manufacturer shall accept return of the assistive device from the consumer and refund the full purchase price or replace the assistive device[.]" (Emphasis added.) The Act defines a "nonconformity" as a "defect, malfunction, or condition that fails to conform to any warranty applicable to an assistive device." HRS § 481K–1.

Petitioner's devices] . . . remedied any possible 'non-conformity.' " Petitioner submitted written argument on October 6, 2005, maintaining that Respondent "sold an assistive device to a consumer without a written warranty that the device was fit for the ordinary purpose for which the device is used," and that "[Petitioner]'s testimony that he returned the aids with the same problem 4 or 5 times was a 'reasonable opportunity to repair' as there was a failure to repair the same nonconformity with two attempts."

Respondent filed a supplemental closing argument on October 25, 2005, in response to the court's October 12, 2005 directive asking for argument on the distinction between "repair" and "adjustment." To that effect, Respondent argued that hearing aids "by design, require programming or 'adjustments' to maximize use by the owner," and that "the [Act] does not apply to a product which inherently operates by periodic adjustment." Petitioner, in his supplemental argument submitted on October 26, 2005, posited that " 'repair' means the manufacturer is to take whatever actions necessary to make the device conform to the warranty," and, therefore, "[t]he legislature intended, whatever word is used, that the manufacturer deliver to a consumer a device that is fit for the purposes for which it was sold."

Following these submissions, on November 3, 2005, the court filed its findings, conclusions of law (conclusions), and decision and order. The court decided that Petitioner's hearing aids were nonconforming under the Act, and that Petitioner had provided Respondent with a reasonable opportunity to correct that nonconformity. Hence, the court concluded that Petitioner was entitled to recovery pursuant to the Act.

### III.

On November 15, 2005, Respondent filed a Notice of Appeal. On November 17, 2005, the court entered a judgment in Petitioner's favor in the amount of $8,610.66, pursuant to the double recovery provision of HRS § 481K–5. *Rapozo*, 118 Hawai'i at 289, 188 P.3d at 803. Respondent then filed an amended notice of appeal on November 25, 2005. The ICA issued its opinion on June 26, 2008. The ICA reversed the court's judgment, determining that the court's findings that "adjustments" made by Respondent constituted repairs under the Act and that the device was therefore repaired or presented for repair on more than one occasion,[8] and that the device was nonconforming, were clearly erroneous. *Id.* at 291–93, 188 P.3d at 805–07.

### IV.

In his Application, Petitioner presents the following questions:

[1.] Whether the [ICA] gravely erred in reversing [the court]'s judgment of November 17, 2005; [9]

[2.] Whether the ICA gravely erred in finding that [the court] *was clearly erroneous in finding that the hearing aids were not fit for their ordinary purpose under [HRS c]hapter 481K* . . . [;]

[3.] Whether the ICA gravely erred in finding that [the court] was clearly erroneous in finding that [Petitioner] *had given*

---

**8.** The ICA states in its opinion that it is "left with a definite and firm conviction that [the court] erred in finding that the adjustments to [Petitioner]'s hearing aids constituted repairs" and that "[the court] clearly erred when it found and concluded that [Petitioner's] hearing aids were repaired, or presented for repair, on more than one occasion." 118 Hawai'i at 292, 188 P.3d at 806. But as discussed in more detail *infra,* the court does not appear to have made the findings attributed to it by the ICA. Respondent raised as a point of error on appeal that "[the court] erred in *implicitly* finding and concluding that [Petitioner]'s hearing aids were 'repaired' on more than one occasion." (Emphasis added.) The ICA's conclusion seems to refer to this supposed

"implicit" finding. In contrast, the relevant findings of the court were that "[t]he manufacturer is presumed to have had a reasonable opportunity to repair the nonconformity if it . . . fails to repair . . . with two attempts"; "[Petitioner] exercised reasonable effort and diligence in returning to [Respondent] for adjustments to the hearing aid"; and "[Petitioner] provided [Respondent] with reasonable opportunity to repair the hearing aid."

**9.** This question poses the ultimate issue and therefore its answer rests on an analysis of questions 2, 3, and 4 that follow.

*[Respondent] a reasonable opportunity to repair the hearing aids* [;]

[4.] Whether the ICA gravely erred in finding that [the court] was clearly erroneous in finding that the *adjustments to [Petitioner's] hearing aids constituted repairs in the context of HRS §[§ ]481K–1, 481K–3(a) and 481K–3(b)(3)* [;]

[5.] Whether the ICA gravely erred by not remanding the case to [the court] *to award damages under HRS [c]hapter 480.*

(Emphases added.)

In conjunction with the fifth question he raises, Petitioner argues that "[t]he ICA erred by not remanding the case to [the court] to award damages under HRS [chapter] 480." This argument is based on language in HRS § 481K–5(c) that "failure by a manufacturer to provide the warranty required by section 481K–2 [ (Supp.2007) ] . . . shall constitute prima facie evidence of an unfair or deceptive practice under chapter 480." The court had found that the warranty provided by Respondent was inadequate under HRS § 481K–2, and Woodard had admitted at trial that he had no knowledge of the warranty required under the Act prior to reading Petitioner's complaint in this action.

■ Petitioner argued on appeal that the case should be remanded for a determination of damages under HRS chapter 480 as Petitioner reasoned that the court had not granted damages under HRS chapter 480 because it had already provided for recovery under chapter 481K. In this regard, the ICA agreed

that the written warranty provided by Respondent was inadequate under the Act,[10] but did not remand the case for a determination of damages because Petitioner did not establish that he had suffered damages as a result of the violation and had not cross-appealed from the court's judgment.[11] 118 Hawai'i at 293, 188 P.3d at 807. The ICA was correct that Petitioner's argument as to HRS chapter 480 is not meritorious inasmuch as Petitioner failed to cross-appeal from the court's judgment, which had not awarded damages under HRS chapter 480. *See id.* Hence, the ICA's judgment is affirmed on this issue.

## V.

■ Initially we note that the question of whether Respondent falls under the definition of "manufacturer" as defined by the Act, was not squarely addressed on appeal. HRS § 481K–2(a) mandates that "[n]o assistive device shall be sold, leased, or delivered in this State to a consumer unless accompanied by a written warranty *under which the manufacturer warrants* that the assistive device is fit for the ordinary purposes for which the device is used[.]" HRS § 481K–1 provides that a "manufacturer" is "a person who manufactures or assembles assistive devices and *agents of that person, including* an importer, a distributor, a factory branch, distributor branch, and a *warrantor of the manufacturer's assistive device, but does not include an assistive device dealer.*" (Emphases added.) An "assistive device dealer" is defined as "a

10. With regard to the warranties, Respondent argued on appeal that the court erred in concluding that "the warranties provided by [Respondent] and the manufacturer, [Starkey], failed to comply with the provisions of HRS § 481K–2(a) and (b)." The court's findings with regard to the warranty were as follows:

> 33. Section 481K–2(b) requires that the duration of the warranty be "not less than one year after first possession of the assistive device by the consumer" and tolls and extends the warranty period under specific conditions.
> 34. The warranty documentation provided to [Petitioner] by [Respondent] did not comply with the express and unambiguous requirements set forth in HRS [§ ]481K–2(a) and (b); under the provisions of HRS [§ ]481K–2(d), [Respondent] is deemed to have given [Petitioner] the warranty required by said statutory sections.

Respondent's argument is without merit, as there is nothing in the warranties it provided that warrants that the devices will be fit for their ordinary purpose, and that it would repair any nonconformity to that effect without charge for at least one year, as required by HRS § 481K–2(a) and (b).

11. The ICA concluded that,

> [n]otwithstanding [Respondent's] failure to provide [Petitioner] with the required written warranty of fitness for ordinary purposes under HRS § 481K–2(a), [Petitioner] did not establish that he suffered any "damages caused by that violation." HRS § 481K–5(c). . . . [The court] did not award [Petitioner] damages under HRS chapter 480 and [Petitioner] did not cross-appeal from [the court]'s judgment.

118 Hawai'i at 293, 188 P.3d at 807 (brackets omitted).

person who is in the business of selling new assistive devices." HRS § 481K–1.

As the ICA noted, "[i]n [finding] 31, [the court] found: [Starkey] is a manufacturer under the meaning of HRS [§ ]481K–1. [Respondent] is an agent of [Starkey] and, therefore, is also considered a 'manufacturer' within the meaning of HRS [§ ]481K–1." *Rapozo*, 118 Hawai'i at 290 n. 7, 188 P.3d at 804 n. 7. Because Respondent did not challenge that finding on appeal, the ICA did not address the issue of whether Respondent qualified as a "manufacturer" under the statutory definition, but only noted that assistive device dealers are excluded from the statutory definition. *See id.*

However, in his Application, Petitioner observed that "[a]lthough the ICA declined to address the issue of whether or not [Respondent] was a manufacturer, ... [t]he ICA questioned [finding] 31 whereby [the court] found [Respondent] to be a manufacturer." Petitioner argues in his Application that "an assistive device dealer who also serves as an agent and/or warrantor of the manufacturer" should be included within the definition of "manufacturer" because otherwise "[a]nyone who sold new assistive devices [including a manufacturer through a factory branch] could provide a warranty and be immune from suit on that warranty."

In this context, we observe that the court was not clearly erroneous in finding that Respondent is an *agent* that was a *warrantor* of the manufacturer's, *i.e.* Starkey's, assistive device. The relevant evidence is set forth in the following findings:

5. [Petitioner] was given a Warranty Card which indicated a warranty expiration date of February 18, 2005. . . .

6. According to the testimony [of Woodard], hearing aid fitter/dealer and owner of [Respondent], [Respondent] provides its customers with a handout summarizing customer service guarantees and manufacturer warranty information. The handout states that all new hearing aid purchases come with a 30 day total satisfaction money back guarantee. In addition, the handout references [Starkey's] replacement and repair coverages for the one year period after purchase.

. . . .

25. According to Woodard, [Respondent] is the dealer for [Starkey] in the County of Kauai, State of Hawaii.

26. Woodard testified that when a hearing aid is sold to a customer, there is no direct contact between [Starkey] and the customer. Instead, [Respondent] is the liaison and *performs as [Starkey's] agent* in the County of Kauai, State of Hawaii.

. . . .

31. [Starkey] is a manufacturer under the meaning of HRS [§ ]481K–1. [Respondent] is an agent of [Starkey] and, therefore, is also considered a "manufacturer" within the meaning of HRS [§ ]481K–1.

(Citation omitted.) (Emphasis added.) It is undisputed that Petitioner only had contact with Respondent and not Starkey, and it was Respondent who provided Petitioner with the warranties. As the warranty card indicated, Petitioner was to return to Respondent if he had problems with the aids, and was not provided any contact information for Starkey. In selling Petitioner the hearing aids Respondent was apparently acting as an assistive device dealer. Manifestly, Respondent was also acting as Starkey's agent in the capacity of a warrantor, and therefore, in that capacity, was governed by the Act's requirements pertaining to a "manufacturer." *See* HRS § 481K–1. The alternative view, under which the terms "manufacturer" and "assistive device dealer" would be viewed as mutually exclusive, would allow for the legally absurd result that consumers would be left without any recourse under the Act, in the situation where a manufacturer or an agent, in this case a warrantor, also served as a dealer of new devices.

## VI.

The questions raised in this case revolve around the proper application of HRS chapter 481K. HRS § 481K–3(a) provides in pertinent part:

(a) If the manufacturer or its agents *fail to correct* a *nonconformity* as required by a warranty *after a reasonable opportunity to repair*, the *manufacturer shall accept return* of the assistive device from the

consumer *and refund the full purchase price* or replace the assistive device. . . .

(Emphases added.) The relevant portion of HRS § 481K-5 provides for a right of action as follows:

(c) In addition to pursuing other remedies, a consumer may bring an action to recover damages caused by a violation of this chapter. *The court shall award a consumer who prevails in the action twice the amount of any pecuniary loss, together with costs, disbursements, and reasonable attorney fees,* and any equitable relief that the court may determine is appropriate. . . .

(Emphasis added.) Therefore, if a manufacturer fails to correct a nonconforming device after a "reasonable opportunity to repair" and does not provide the consumer with a refund or a replacement, then the consumer is entitled to recovery under HRS § 481K-5.

## VII.

■ The ICA's holding that the court erred in concluding that Petitioner was entitled to recovery was based entirely on its belief that certain of the court's findings were clearly erroneous. 118 Hawai'i at 293, 188 P.3d at 807. The court's findings, as well as any conclusions that present mixed questions of fact and law, are reviewed under the clearly erroneous standard. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 116-17, 119, 839 P.2d 10, 27-28, 29 (1992).

A [finding] is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Office of Hawaiian Affairs v. Hous. & Cmty. Dev. Corp. of Hawaii (HCDCH),* 117 Hawai'i 174, 189, 177 P.3d 884, 899 (2008) (quoting *Estate of Klink ex rel. Klink v. State,* 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007)).

The central conclusion of the court, that Respondent violated chapter 481K, was based on its findings that (1) Petitioner's hearing aids were not fit for their ordinary purpose for which they were used and (2) Petitioner provided Respondent with a reasonable opportunity to repair the hearing aids. The ICA appears to have determined that there was a lack of substantial evidence in the record for the court's finding that the hearing aids were nonconforming, and, despite substantial evidence regarding repairs, it was left with a definite and firm conviction that the court erred in finding that Respondent had a reasonable opportunity to repair the aids. However, we conclude that the court's findings that the hearing aids were nonconforming and that Respondent had a reasonable opportunity to repair the devices were not clearly erroneous. Accordingly, the judgment of the ICA must be reversed, and the decision of the court reinstated.

## VIII.

We believe that the ICA's error proceeds from its narrow application of HRS chapter 481K. The plain language of the Act is aimed at protecting the interests of individuals who are dependent upon assistive technology devices in their daily lives.[12] Moreover, it is evident that the language of the Act is broader in scope than that propounded by the ICA. Distinctions that unnecessarily constrict the application of the Act redound to the detriment of disabled consumers for whose protection the Act was intended. As discussed below, the meanings of "nonconformity" and "repair" are sufficiently broad to encompass the circumstances of Petitioner's case.

12. Testimony in support of the Act was received from several individuals and the following organizations: Office of Consumer Protection, State Planning Council on Developmental Disabilities, Hawaii Assistive Technology Training and Services, Hawaii Centers for Independent Living, Protection and Advocacy Agency of Hawaii, and the Commission on Persons With Disabilities. Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1204-05; Hse. Stand. Comm. Rep. No. 1669, in 1997 House Journal, at 1757.

## IX.

In connection with the nonconformity issue raised in the second question by Petitioner, the pertinent court findings state as follows:

9. After [Petitioner] took delivery of the hearing aid and attempted to use it in a variety of social settings, he experienced difficulties. *[Petitioner] testified that at times, he would be able to hear only sounds in close proximity; at other times, he was unable to hear sounds at close range and could only hear sounds at greater distances.*

10. [Petitioner] testified that it was obvious to him that the hearing aid needed to be adjusted and, to that end, he *brought in the hearing aid to [Respondent]'s place of business for adjustment some four to five times during the first few months.*

11. At some point approximately four to six months after purchase, [Petitioner] noticed that, *in addition to the earlier problems he had experienced in hearing a variety of sounds, the hearing aid was now making clicking noises.*

. . . .

15. After the hearing aid was returned from [Starkey], [Petitioner] went into [Respondent]'s place of business to try the repaired hearing aid. *After an adjustment by [Kadar], [Respondent]'s employee, the hearing aid was still not working properly. [Petitioner] testified that the "clicking sounds" were still present and that he still could not hear properly with the hearing aid.*

16. [Petitioner] testified that, *after the repair by [Starkey], he attended his class reunion and was unable to hear persons at this table although he could hear sounds from more distant tables.*

17. By letter dated June 17, 2004, [Mrs. Rapozo] wrote to [Respondent] and informed [Respondent] that [Petitioner] was "not getting the effects required off of the use of his hearing aide [sic]." Mrs. Rapozo

inquired if there was a possibility of returning the unit.

. . . .

40. Despite attempts at effecting adjustments and/or repair, [Petitioner] continued to experience problems such as clicking in the hearing aid and difficulty in hearing either close sounds or distant sounds.

41. *Based upon the testimony of [Petitioner]* regarding the problems he experienced while using the hearing aid, *[Petitioner]'s hearing aid was not fit for its ordinary purpose.* [Petitioner]'s hearing aid therefore had a "nonconformity", within the meaning of HRS Section 481K–1. [13]

(Emphases added.)

### A.

The ICA cited to the statutory definition of "nonconformity" in its general discussion of the Act. But in ruling that the court erred in finding the devices were nonconforming, the ICA reasoned that "the need for adjustment, without more, is not a nonconformity in a hearing aid." 118 Hawai'i at 293, 188 P.3d at 807. The ICA relied on the "undisputed testimony" of Respondent that "the ordinary purpose of a hearing aid is to provide amplification, but unfortunately, these assistive devices do not provide a perfect replacement for the fully functioning human ear." *Id.* The ICA then concluded that "[t]here is no evidence, *including in [Petitioner]'s testimony,* that the hearing aids were defective, malfunctioning or were unfit for their ordinary purpose after the May 2004 repair[,]" and that Petitioner was "not willing to work on further adjustments to the hearing aids." *Id.* (emphasis added.)

■ However, first, the ICA's belief that "the need for adjustment, without more, is not a nonconformity," *id.*, and that Petitioner's testimony was not evidence of "nonconformity," is inconsistent both with the broad definitions of "nonconformity" adopted in the Act and with the purposes of the Act. *See* discussion *infra.* According to the Act, a

13. Respondent's argument on appeal to the ICA was that "[the court] erred in finding and concluding that [Petitioner]'s hearing aids were not fit for their intended purpose and therefore had a 'nonconformity,' within the meaning of HRS § 481K–1[,]" referring to finding 41. As discussed *infra,* this argument is without merit in that there was substantial evidence supporting the court's finding that "[Petitioner]'s hearing aid was not fit for its ordinary purpose."

"nonconformity" is a "defect, malfunction, or condition that fails to conform to any warranty applicable to an assistive device." HRS § 481K–1 (emphasis added). The foregoing underscored terms are not defined in the Act. "This court has said that '[w]e may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.'" *Leslie v. Bd. of Appeals of County of Hawaii*, 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) (quoting *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001)). The Webster's dictionary definition of "defect" includes "shortcoming" or "a want or absence of something necessary for completeness, perfection, or *adequacy in form or function.*" *Webster's Third New Int'l Dictionary* 591 (1961) (emphasis added). "Malfunction" includes "*to function badly* or imperfectly: *fail to operate in the normal or usual manner.*" *Id.* at 1367 (emphases added). "Condition" includes "*something needing remedy.*" *Id.* at 473 (emphasis added). It is evident, then, that the term "nonconformity" encompasses a wide variety of problems that might prevent consumers' efficient use of assistive devices.

The Act's definition of "warranty" sheds further light on the meaning to be attributed to "nonconformity." HRS § 481K–3(a) requires the manufacturer to accept return of the device if the manufacturer "fail[s] to correct a nonconformity *as required by a warranty*[.]" (Emphasis added.) HRS § 481K–2(a) in turn requires the manufacturer to "warrant[ ] that the assistive device is *fit for the ordinary purposes for which the device is used,* and undertake[ ] to pay the full cost of both parts and labor necessary to repair any *nonconformity.*" (Emphases added.) HRS § 481K–1, the definitions section of the statute, provides a definition for "assistive device," which includes "hearing [aids] ... and other [aids] that *enhance an individual's ability to hear* ... and any other device that *enables a person with a disability to ... hear*[.]" (Emphases added.) Therefore, Respondent's argument that the purpose of a hearing aid is solely "to provide amplifica-

tion," without regard to whether it actually assists the individual with his or her hearing, is inconsistent with the statutory definition for a hearing aid. As Petitioner responds, "[Respondent's] definition confuses the ordinary purpose for which a hearing aid is used (to assist people with their hearing) with the *means* by which the purpose is accomplished (amplification of sound)." [14] (Emphasis in original.)

■ The substantial evidence in the record supporting the court's findings that the devices were functioning inadequately includes (1) Petitioner's testimony that (a) he was hearing "[a]ll kinds of sounds and things like that [and n]ot hearing what [he] wanted to hear up close when [he] needed to, and when [he] needed to hear far away [he] couldn't hear"; (b) he "started having clicking sounds"; (c) he "attended [his] class reunion, and [he] could not hear anybody within [sic] [his] table, but [he] could hear the sounds away from [his] table"; and (d) he did not notice any change in his ability to hear throughout the adjustment process, but continued to have the same problems; (2) as well as the admission of Respondent's technician, Kadar, that (a) she "[knew] that [Petitioner was] very frustrated and felt hopeless with the aids that we had" and (b) that she also "felt very helpless not providing [Petitioner] with the service he needed." Hence, the ICA's conclusion that there was "no evidence" supporting the court's finding that Petitioner's hearing aids were nonconforming, including after the May 2004 repair, 118 Hawai'i at 293, 188 P.3d at 807, was wrong.

**B.**

■ Second, the ICA erred in making the credibility determination that "it appears" that Petitioner was "not willing" to return for further repairs after May 2004. 118 Hawai'i at 293, 188 P.3d at 807. The credibility of Petitioner's testimony, as well as the weight to be given his testimony and other evidence on the question of nonconformance, as opposed to the evidence submitted by Respondent, were not matters within the province of

---

14. In referring to this statement, this court renders no judgment as to whether the purpose of the digital hearing aids was only to amplify sound.

the ICA, but were for the court to determine. *See LeMay v. Leander*, 92 Hawaiʻi 614, 626, 994 P.2d 546, 558 (2000) ("This court has long observed that it is within the province of the trier of fact to weigh the evidence and to assess the credibility of the witnesses, and this court will refrain from interfering in those determinations.")

Based on the record, there is substantial evidence, as indicated *supra*, that Petitioner's devices were not functioning "adequa[tely]" or "normal[ly]." *See Webster's Third New Int'l Dictionary* at 591, 1367. The evidence shows that the devices were functioning poorly and inadequately, so much so that, despite his hearing disability, there was evidence that Petitioner never used the devices for a full day, and determined that he was better off not using them at all. Based on Petitioner's testimony that he was at times only able to hear sounds that were close and at times only able to hear sounds from far away, and that he heard all kinds of noises, the court could properly draw the conclusion that Petitioner's hearing aids were not fit for their ordinary purpose.[15]

## X.

■ The legislative history confirms that the terms in the Act should be liberally applied, and supports the conclusion that the ICA's application was too restrictive. As we reiterated in *E & J Lounge Operating Co. v. Liquor Commission of the City & County of Honolulu*, 118 Hawaiʻi 320, 335, 189 P.3d 432, 447 (2008), "[l]egislative history may be used to confirm interpretation of a statute's plain language[.]" (Citing *Blaisdell v. Dep't of Pub. Safety*, 113 Hawaiʻi 315, 319 n. 5, 151 P.3d 796, 800 n. 5 (2007).)

According to the legislative history of the Act, "[t]he purpose of the bill is to provide consumers with *additional* warranty remedies in connection with the purchase of assistive devices for persons with disabilities," Hse. Stand. Comm. Rep. No. 1669, in 1997 House Journal, at 1757 (emphasis added), and to "provide *increased* protection[,]" Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1205 (emphasis added); *see also Kalima v. State*, 111 Hawaiʻi 84, 100, 137 P.3d 990, 1006 (2006) ("This court has stated that remedial statutes should be liberally construed to suppress the perceived evil and advance the enacted remedy and has disfavored narrow interpretations that impede rather than advance the remedies provided by such statutes." (Internal quotation marks and citation omitted.)).

■ As noted in the Senate Committee Report for HRS chapter 481K, "assistive devices are an integral part of the lives of many individuals, the elderly and persons with disabilities in particular. For these people, it is *absolutely critical* to have equipment that is *reliable and effective.*" Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1205 (emphases added). The legislature emphasized that "it is important that these assistive devices *work properly at all times,*" Hse. Stand. Comm. Rep. No. 1669, in 1997 House Journal, at 1757 (emphasis added), and "*absolutely critical* to have equipment that is *reliable and effective*[,]" Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1204–05 (emphases added). Plainly, then, the Act must be construed liberally in favor of those individuals for whom it was enacted to protect. *See, e.g., Buscher v. Boning*, 114

---

15. Petitioner does not raise the ICA's conclusion that "there is no evidence whatsoever to support [the court's] finding" that Petitioner continued to hear clicking sounds after the May 2004 repair, 118 Hawaiʻi at 292, 188 P.3d at 806, as a point of error in his Application. The ICA had concluded that the " 'clicking sounds' clearly constituted a nonconformity," and apparently decided that, because, according to Respondent, those were corrected by the May 2004 repair, Petitioner's devices were no longer nonconforming after that point. *Id.* at 291, 293, 188 P.3d at 805, 807. However, the failure to claim error on the part of the ICA as to this conclusion does not adversely impact the court's ultimate finding that the devices were nonconforming. As Petitioner argues, because the entirety of the other evidence supported the conclusion that Petitioner's hearing aids were not working correctly, whether the clicking sounds continued after the May repair was not necessary to the court's finding that the aids were nonconforming. This addresses Respondent's argument on appeal that "[the court] erred in finding that, after repairs were completed by the manufacturer ... [Petitioner] continued to experience 'clicking sounds.' " Respondent had asserted that the court's findings 15 and 40, set forth above in full *supra* at pages 18, 19, were in error.

Hawai'i 202, 219, 159 P.3d 814, 831 (2007) (recognizing that "we must construe the fourth paragraph of HRS § 386–8 to give full effect to the intent of the legislature, which sought to protect the rights of both employees and employers" (quoting *Shimabuku v. Montgomery Elevator Co.,* 79 Hawai'i 352, 358, 903 P.2d 48, 53 (1995))); *Camara v. Agsalud,* 67 Haw. 212, 217, 685 P.2d 794, 797 (1984) (finding with regard to Hawaii's unemployment compensation statute that "[i]n view of the basic policy of the statute of protecting the worker from the hazard of unemployment, our courts must view with caution any construction which would narrow the coverage of the statute and deprive qualified persons of the benefits thereunder"); *Han v. Yang,* 84 Hawai'i 162, 177, 931 P.2d 604, 619 (App.1997) (finding that HRS § 480–2 "was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen" (internal quotation marks, citation, and brackets omitted)).

## XI.

With respect to Petitioner's third and fourth questions relating to the difference between "adjustments" and repairs, the ICA accepted Respondent's formulation. The ICA decided that it "must consider whether the 'adjustments' that preceded the May 2004 repair also constituted repairs[,]" 118 Hawai'i at 291, 188 P.3d at 805, instead of evaluating whether the court was clearly erroneous in finding that Petitioner provided Respondent with *a reasonable opportunity to repair* the devices. In this regard, five grounds were set forth by the ICA: (1) "[a]lthough the [Act] does not state that the failure to repair after two attempts or over thirty business days out of service are the exclusive means for establishing that a manufacturer had a reasonable opportunity to repair, no alternative theory or evidence was offered in this case"; (2) the "adjustments" that preceded the May 2004 repair did not constitute repairs because they are "anticipated and necessary for any hearing aid"; (3) the "unchallenged and uncontroverted testimony [is] ... that the 'ordinary purpose' of a

hearing aid is to amplify sound for the user by working with the user's existing hearing ability through a series of adjustments"; (4) "there is no evidence that [Petitioner] ... provided [Respondent] with written notice that the hearing aids were nonconforming"; and (5) "[Petitioner] participated in an initial in-store adjustment of the refurbished aids, but did not return for further adjustments after wearing the aids in public." 118 Hawai'i at 291–92, 188 P.3d at 805–06. For those reasons, the ICA was "left with a definite and firm conviction that [the court] erred in finding that the adjustments ... constituted repairs" and therefore "[the court] clearly erred when it found and concluded that [Petitioner]'s hearing aids were repaired, or presented for repair, on more than one occasion." *Id.* at 292, 188 P.3d at 806.

## A.

Because the ICA's first ground focused on the presumption in the statute that two attempts is evidence of a "reasonable opportunity to repair," its second ground necessarily focused on whether the "adjustments" constituted repairs and thereby satisfied that presumption. As a threshold matter it must be observed that the term "repair" is not defined in the Act. The meaning of "repair" includes "to make good" or "remedy," and a repair includes "restoration to a state of soundness, efficiency, or health." *Webster's Third New Int'l Dictionary* at 1923. *See Leslie,* 109 Hawai'i at 393, 126 P.3d at 1080 ("We may resort to legal or other well accepted dictionaries ... to determine the ordinary meaning of certain terms not statutorily defined" (internal quotation marks and citation omitted)). That definition comports with a liberal construction of the Act in line with the legislature's desire to ensure that disabled and elderly consumers are in possession of efficiently functioning assistive devices. *See* Hse. Stand. Comm. Rep. No. 1669, in 1997 House Journal, at 1757; Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1204–05. However, the ICA reasoned that "an adjustment is not a repair because the purpose of an adjustment is not to fix a defect or other nonconformity, but

rather to make a properly working device perform at its best for the user's needs." *Rapozo*, 118 Hawai'i at 291, 188 P.3d at 805.

The Act does not employ the term "adjustment," but the terms "correct" and "repair." It was Respondent that advanced a purported distinction between "adjustments" and "repairs," which the ICA adopted on appeal. Respondent argues that "[a]lthough unclear in [the court]'s [findings and conclusions], [the court] appears to have improperly assumed ... that the periodic 'adjustments' made to the hearing aids after [Petitioner] purchased the aids and before the clicking sound presented itself, constituted forms of 'repair.' "

Respondent speculates that the court's "erroneous assumption" must be attributed to Petitioner's supplemental argument pursuant to the court's request for the parties to address what is meant by "repair" in the context of the Act. It argues that Petitioner's definition of "repair," which is "the placing of the device into compliance with the warranty," is "circular," "self-serving," and "without support." However, Petitioner is correct that HRS § 481K–3 conditions the consumer's recovery of a refund on whether "the manufacturer or its agents *fail to correct a nonconformity as required by a warranty.*" HRS § 481K–3. As explained *supra,* the warranty imposed by the statute requires the manufacturer to ensure that the device is fit for the ordinary purpose for which the device is used, in this case to assist a consumer's hearing, and Petitioner is correct to assume that any repair would be directed toward fulfilling that warranty.

The definition of "repair" adopted by the ICA does not account for the dictionary meanings of "to make good" or to "remedy" or to "restore[ ]" "to a state of soundness [and] efficiency." *See Webster's Third New Int'l Dictionary* at 1923. Additionally, the language of the Act indicates that the terms "correct" and "repair" are employed in relationship to one another, *i.e.,* the consumer is to allow the manufacturer a "reasonable opportunity to *repair*" in order to "*correct* [the] nonconformity." HRS § 481K–3 (emphases added.) Neither the ICA nor Respondent considered the definition of "cor-

rect," which, according to the dictionary, means "to make or set right" or "to alter or *adjust* so as to bring to some standard or required condition." *Webster's Third New Int'l Dictionary* at 511 (emphasis added.)

The plain meaning of the term "correct" indicates the Act contemplated that an "adjustment" is in fact in the realm of actions a manufacturer might take in order to remedy a device that is not functioning adequately. Accordingly, an adjustment is included within the term "repair" inasmuch as the purpose of the "repair" is to "correct" a nonconformity. The court thus could find, under the circumstances of this case, that Petitioner's efforts to return for "adjustments" were a factor, among others, in determining whether Petitioner provided Respondent with a reasonable opportunity to "repair" the nonconformity.

Indeed, the ICA's definitions of "nonconformity" and "repair" are circular. Its conclusion that "an adjustment is not a repair because the purpose of an adjustment is not to fix a defect or other nonconformity," and, thus, "the need for an adjustment, without more, is not a nonconformity," *Rapozo,* 118 Hawai'i at 291, 293, 188 P.3d at 805, 807, defines the terms in light of one another without offering a meaningful definition for either term. As Petitioner notes, if the ICA's construction of the Act were to control, all a manufacturer would need to do in order to avoid liability under chapter 481K would be to define whatever attempts it made to fix any problem identified by the consumer as merely "adjustments."

Thus, a manufacturer could always claim that what the consumer perceived to be a malfunction was actually a "properly working device" that was not performing "at its best." Under Respondent's formulation, a consumer would be compelled to keep and pay for a device, and continue repeatedly to return for more and more "adjustments," even when those adjustments were not doing anything to "correct" the problem. This would conflict with the language of the Act and defeat the intent of the Act, for the legislature determined that "it is absolutely critical to have equipment that is reliable and effective."

*See* Sen. Stand. Comm. Rep. No. 792, in 1997 Senate Journal, at 1205.

Therefore, the ICA's third ground that the "unchallenged and uncontroverted testimony" by Respondent that the "'ordinary purpose of a hearing aid is to amplify sound ... through a series of adjustments," is wrong. As addressed *supra,* the Act's definition of "assistive device" makes manifest that the purpose of a hearing aid is to assist the consumer with his or her hearing. Based on the court's assessment of credibility and its weighing of the evidence, *see* discussion *infra,* under the circumstances of this case, the devices did not perform according to their ordinary purpose and were in need of repair, adjustment, correction, or an appropriate remedy.

### B.

Moreover, the plain language of the Act requires that if the manufacturer is provided a reasonable opportunity to repair, and yet fails to correct the problem, as required by warranty, the consumer is entitled to a refund. The ICA's first and second grounds focus on the number of times that the devices were or were not repaired by Respondent. However, the court did not find that Respondent actually repaired the devices on more than one occasion but, rather, as allowed under the Act, that Petitioner provided Respondent with a *reasonable opportunity to repair* the device on more than one occasion. The court's relevant findings are as follows:

38. The manufacturer is presumed to have had a reasonable opportunity to repair the nonconformity if it (or its agents) fails to repair the same nonconformity with two attempts. (*See* HRS [§ ]481K–3(b)(3)).

39. After taking possession of the hearing aid, *[Petitioner] exercised reasonable effort and diligence in returning to [Respondent] for adjustments to the hearing aid in an effort to use the hearing aid for its ordinary purpose.* [Petitioner] also allowed [Respondent] to ship the hearing aid to [Starkey] for repair.

40. *Despite attempts at effecting adjustments and/or repair, [Petitioner] continued to experience problems* such as clicking in the hearing aid and difficulty in hearing either close sounds or distant sounds.

41. *Based upon the testimony of [Petitioner]* regarding the problems he experienced while using the hearing aid, *[Petitioner's] hearing aid was not fit for its ordinary purpose.* [Petitioner's] hearing aid therefore had a "nonconformity" within the meaning of HRS [§ ]481K–1.

42. *[Petitioner] provided [Respondent] with reasonable opportunity to repair the hearing aid prior to and after requesting a refund* on the purchase price of the hearing aid.

(Emphases added.) [16] Therefore, although the Act codifies a presumption that the manufacturer had a reasonable opportunity to repair under certain circumstances,[17] the court did not have to rely on those presumptions. Correspondingly, it makes no difference that no alternative theory was offered, as the ICA contended should be the case, inasmuch as the Act does not require a party to present an alternative theory. Rather, the court could have properly concluded, based on the entirety of the evidence adduced at trial and on the additional post-trial briefing, that Petitioner provided Respondent with a reasonable opportunity to repair, and that Respondent failed to correct the problems that Petitioner was experiencing. *See* HRS § 481K–3(a) ("If the manufacturer or its agents fail to correct a nonconformity as required by a warranty after a reasonable opportunity to repair, the manufacturer shall

---

16. Respondent challenged findings 38 through 42 on appeal. Inasmuch as there was substantial evidence supporting those findings, they were not clearly erroneous, and therefore Respondent's challenge is without merit.

17. HRS § 481K–3(b)(3) states as follows:

It shall be presumed that a manufacturer has had a "reasonable opportunity to repair" if the manufacturer or its agents *fails to repair the same nonconformity with two attempts, or the assistive device is out of service,* including by reason of attempts to repair one or more nonconformities, *for a cumulative total of more than thirty business days* after the consumer has returned it for repair.

(Emphases added.)

accept return of the assistive device from the consumer and refund the full purchase price or replace the assistive device[.]")

■ The evidence supporting the conclusion that Petitioner provided Respondent with a reasonable opportunity to repair includes Petitioner's testimony, as related in findings 10–12, 14–17, and 39–42,[18] that (1) he returned the device four to five times prior to the May repair; (2) he was without the device for "about a month" during the course of the May repair; (3) he came in for another "adjustment" when the device was returned from the manufacturer in late May; and (4) throughout the course of these adjustments, he noticed no change in the device but continued to experience the same problems.

In making these findings, the court apparently relied on the testimony of Petitioner and found such testimony credible. It was for the court to make the credibility determination on this testimony. *See LeMay*, 92 Hawai'i at 626, 994 P.2d at 558 (stating that the credibility of the witnesses and weight of the evidence fall within the province of the trier of fact). Based on the foregoing review of the evidence in the record, it cannot be said that the court clearly made a mistake, as the ICA held, in finding that Respondent had a reasonable opportunity to repair the devices.

### C.

Finally, the ICA's fourth and fifth grounds for concluding that the devices were not presented for repair on more than one occasion were that the Petitioner did not return for further repairs after May 2004, and that when he returned the aids in September or October of 2004, "he was not making them

available for repair and did not provide notice of or otherwise identify a nonconformity to be repaired." 118 Hawai'i at 292, 188 P.3d at 806.

In reference to whether or not Petitioner provided Respondent with adequate notice, the ICA in a footnote quoted from HRS § 481K–2(f) as follows:

A consumer shall make an assistive device available for repair *by presenting it* to the manufacturer, its agent, representative, authorized assistive device dealer, or authorized assistive device lessor prior to the expiration of the warranty period *and providing* the manufacturer, its agent, representative, authorized assistive device dealer, or authorized assistive device lessor written *notice of the nonconformity.*

*Id.* at 292 n. 9, 188 P.3d at 806 n. 9 (emphases supplied). However, on appeal, Respondent did not raise the notice issue as a basis for reversing the court's decision.[19] Accordingly, Respondent did not challenge the notice given by Petitioner as inadequate. Instead, Respondent opted to focus on whether the devices were repaired on more than one occasion.[20]

■ However, it is undisputed that Petitioner's wife notified Respondent in writing in her June 17, 2004 letter of his continued problems despite having come in for adjustments. The court's findings indicate that Respondent received adequate notice inasmuch as it found that "[Petitioner] brought in the hearing aid ... for adjustment some four or five times during the first few months"; "[i]n May 2004, after being informed of [Petitioner's] complaints about the performance of the hearing aid, [Respondent] sent [Petition-

---

18. The relevant court findings 10–11, 15–17, and 39–42, are set forth in full *supra*. Further evidence that Respondent had a reasonable opportunity to repair is laid out in findings 12 and 14, which state as follows:

  12. In May 2004, after being informed of [Petitioner's] complaints about the performance of the hearing aid, [Respondent] sent [Petitioner's] hearing aid to [Starkey] for repair....

  ....

  14. According to [Respondent], the repair by [Starkey] took approximately one and one-half weeks; [Petitioner] recalls that he went with-

out the hearing aid for approximately 30 days during the manufacturer's repair period.

19. Respondent did not raise the notice issue on appeal. The ICA apparently raised and decided this issue *sua sponte* in its analysis.

20. Because the ICA apparently raised this matter, Petitioner in his Application argued that "[i]t is clear that [Respondent]'s technician was aware of the nature of the nonconformity and [Respondent] was not prejudiced by the lack of any written notice, nor was [Petitioner] ever advised that a writing was necessary."

er's] hearing aid to [Starkey] for repair"; "[Mrs. Rapozo] wrote to [Respondent] and informed [Respondent] that [Petitioner] was 'not getting the effects required off of the use of his hearing aide [sic]'"; and "[Petitioner] exercised reasonable effort and diligence in returning to [Respondent] for adjustments to the hearing aid." There is no clear error with respect to these findings.

With regard to whether Petitioner returned for repairs following the May 2004 repair, according to the court's findings (based on Petitioner's testimony), Petitioner went in for an adjustment immediately following the return of the aids in May 2004, after which the aids were still not working properly. Following that visit, Mrs. Rapozo notified Respondent *in writing* that Petitioner was continuing to have problems with his aids and asked about returning the aids. The court further found that although Woodard claimed that he had instructed Kadar to tell Petitioner to come in for further adjustments, Kadar never did so. The court did not find that when Petitioner returned the devices in the fall of 2004, he was not making them available for repair, but found that "[i]n late September or early October 2004, [Petitioner] returned the hearing aid to [Respondent]" and that Respondent "made a few adjustments to the hearing aid ... [but] made no further attempt to repair the hearing aid or to send the hearing aid to [Starkey]...." Therefore, the evidence presented and the court's findings do not support the ICA's conclusion that Petitioner was not making the aids available for repair. To the contrary, it appears that, despite further adjustments to the aids after the May 2004 repair, the aids were still not functioning properly.

21. On appeal Respondent challenged the following conclusions:

> 4. Pursuant to HRS [§ ]481K–3(a)(1)(A), [Respondent] was required to refund to [Petitioner] the full purchase price of the hearing aid plus all collateral charges and incidental charges, less a reasonable allowance in use.
> 5. The acts and omissions of [Respondent] constituted a violation of Chapter 481K, for which [Petitioner] is entitled to recover twice the amount of any pecuniary loss, together with costs, disbursements and reasonable attorneys fees, pursuant to HRS [§ ]481K–5(c).

## XII.

■■■ The court's findings must be given appropriate deference. *See Briones v. State,* 74 Haw. 442, 464, 848 P.2d 966, 977 (1993) ("Appellate courts defer to the judge or jury as fact finder unless no substantial evidence existed for their finding because the fact finder is uniquely qualified to evaluate the credibility of witnesses and to weigh the evidence."). Here, the findings adopted by the court were supported by substantial evidence and, considering the entire record, it cannot be said reasonably that a mistake was made. Viewed in its entirety, there was ample evidence to sustain the court's finding that Petitioner purchased hearing aids that were "nonconforming" and, based on the entire record, it was not clearly a mistake for the court to have found that Respondent had a "reasonable opportunity to repair" the devices under the Act.[21]

## XIII.

Based on the reasons noted above, the ICA's September 5, 2008 judgment is affirmed as to Petitioner's HRS 480 claim, but is reversed in all other respects, and the November 17, 2005 judgment of the district court is affirmed.

> 6. [Petitioner] is entitled to recover the principal amount of $8,610.66 ($4,305.33 × 2) from [Respondent] together with costs and reasonable attorneys fees.

That challenge was based entirely on Respondent's arguments that the court erred in finding that the devices had a nonconformity or that there was "any violation of HRS [chapter] 481K." As discussed herein, Respondent's arguments are not meritorious, and therefore, Petitioner was entitled to recovery.